UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CHARLES W. FERRIS III | § | |
| | § | |
| v. | § | |
| | § | CIVIL NO. 4:23-CV-1018-SDJ |
| BLUCORA, INC. KEY | § | |
| LEADERSHIP CHANGE OF | § | |
| CONTROL SEVERANCE PLAN, ET | § | |
| AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Blucora, Inc. Key Leadership Change Of Control Severance Plan and Christopher Walters' Motion to Dismiss. (Dkt. #7). For the following reasons, the motion is granted.

## I. Background

Plaintiff Charles W. Ferris III is the former Vice President of Strategy for BCOR Administrative Services, LLC—a wholly owned subsidiary of Avantax, Inc. (formerly Blucora, Inc.) (collectively, "Blucora" or "Company"). In response to concern about a potential hostile takeover, the Company adopted the Blucora, Inc. Key Leadership Change of Control Severance Plan (the "Plan"). Ferris claims that he is entitled to severance benefits pursuant to the Plan.

### A. The ERISA Plan's Terms

The Plan was enacted "[i]n order to secure the continued services of certain key employees . . . and to ensure their continued dedication to their assigned duties without distraction in the event of any threat or occurrence of a Change of Control." (Dkt. #7-2 at 2).

1

The Plan provides that severance benefits will be paid to employees who experience a "Qualifying Termination." "Qualifying Termination" means a "Participant's termination of Employment which constitutes a termination by the Company without Cause or a resignation by Participant for Good Reason that occurs, in each case, on the day of or during the 12-month period immediately following the consummation of a Change of Control." (Dkt. #7-2 at 6).

A Participant resigns for "Good Reason" if, without his consent, he experiences any of the following:

> (i) a material reduction of or to Participant's duties, authority or responsibilities (provided that a change in Participant's duties, authority or responsibilities as the result of one or more corporate transactions, by itself, does not constitute a material reduction); (ii) a material reduction of Participant's Base Salary; ([iii]) a material reduction of Participant's target annual bonus; ([iv]) a relocation of Participant's principal place of work as reflected in Company records by more than 50 miles; or ([v]) in connection with a Change of Control, the failure of the Company to assign the Plan to a successor to the Company or the failure of a successor to the Company to explicitly assume and agree to be bound by the Plan.

(Dkt. #7-2 at 5).[1]

The Plan also describes what does *not* constitute a Qualifying Termination. Relevant here, a Qualifying Termination does not include

> (v) the cessation of Participant's employment with the Company or any Affiliate as the result of the sale, spin-off or other divestiture of a division, business unit or subsidiary or a merger or other business combination followed by employment or reemployment with the purchaser or successor in interest to Participant's employer with regard

---

[1] For a resignation to qualify under this definition, a Participant must (1) notify the Company of the "existence of the condition which participant believes constitutes Good Reason within 30 days of the initial existence of such condition," (2) give the Company 30 days to remedy the condition, and (3) "actually terminate[] Employment within 30 days after the expiration of the Good Reason Cure Period." (Dkt. #7-2 at 5).

to such division, business unit or subsidiary, or an offer of employment by such purchaser or successor in interest on terms and conditions substantially comparable in the aggregate (as determined by the Plan Administrator in its sole discretion) to the terms and conditions of Participant's employment with the Company or its subsidiary immediately prior to such transaction.

(Dkt. #7-2 at 6).

The Plan gives the Plan Administrator the "duty and authority to interpret and construe, in its sole discretion, the terms of the Plan in regard to all questions of eligibility, the status and rights of Participants, and the manner, time and amount of any payment under the Plan." (Dkt. #7-2 at 10).

## B. The Change of Control

As foreshadowed by the Plan, Blucora eventually experienced a Change of Control when it sold its tax-focused subsidiaries—TaxAct Holdings, Inc., TaxAct Admin Services LLC ("New LLC"), and TaxSmart Research, LLC—to Franklin Cedar Bidco, LLC ("Bidco").[2] The purchase agreement required (a) "the Company to transfer the employment of certain employees who provided services to the tax software business"—including Ferris—"to New LLC no later than immediately prior to the closing of the TaxAct Sale, such that such employees would, by operation of the TaxAct Sale, be employed by Bidco or one of its subsidiaries (including New LLC) after the closing of the TaxAct Sale," and (b) "Bidco to maintain comparability of compensation and certain employee benefits for at least one year following the closing, including with respect to severance benefits." (Dkt. #1 at 4–5). Accordingly,

---

[2] The parties do not dispute that this transaction—deemed the "TaxAct Sale"—constitutes a Change of Control under the Plan.

upon close of the TaxAct Sale, Ferris's employment with Blucora ended and he was assigned to New LLC.

Ferris alleges that his job duties and terms of employment at New LLC were not substantially comparable to his previous employment with Blucora. He alleges that his position—Vice President of Strategy—was essentially eliminated and could not be replicated by New LLC. According to Ferris, he was forced to transition from a "key leadership position" to a "mid-level directorship role focused solely on the operations of New LLC without the organizational oversight he previously was tasked to provide." (Dkt. #1 at 5–6). His duties were allegedly realigned to focus solely on Small Business for New LLC. He no longer reported to the Chief Growth and Marketing Officer, but instead reported to the President of New LLC. Ferris further alleges that his compensation and benefits at New LLC were 21% "less favorable" than what he received at Blucora, and that New LLC does not offer any equity compensation, nor does it offer "executive severance benefits on an on-going basis." (Dkt. #1 at 6).

Because of the alleged degradation of his role and the diminution of his compensation and benefits, Ferris filed a claim with the Plan Administrator, asserting that he incurred a Qualifying Termination and was thus entitled to severance benefits pursuant to the Plan. For reasons described below, the Plan Administrator disagreed that Ferris incurred a Qualifying Termination, and he denied Ferris's claim. Ferris then appealed the Plan Administrator's denial of his

benefits claim, and, once again, the Plan Administrator determined that Ferris was not entitled to severance benefits because he did not incur a Qualifying Termination.

After receiving these two adverse determinations, Ferris brought the present suit pursuant to Section 502(a)(1)(B) and Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendants Blucora, Inc. Key Leadership Change of Control Severance Plan and Christopher Walters—the Plan Administrator—now move to dismiss Ferris's Complaint, arguing, inter alia, that the Plan Administrator did not abuse his discretion in determining that Ferris did not experience a Qualifying Termination.[3]

## II. Legal Standard

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* The court accepts all well-pleaded facts as

---

[3] Ferris originally sued Blucora, Inc. Leadership Change of Control Severance Plan Committee (the "Committee") as well, but he later voluntarily dismissed his claims against the Committee.

true and views them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

In conducting this review, the Court's inquiry is limited to "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). The Court may also consider documents that a defendant attaches to a motion to dismiss if the documents are referred to in the plaintiff's complaint and are central to the claims. *Id.*[4]

### III. DISCUSSION

Ferris is only entitled to severance benefits if his change of employment constituted a Qualifying Termination. Subpart (v) of the Plan explicitly excludes from the definition of "Qualifying Termination"

> the cessation of Participant's employment with the Company . . . as the result of the sale . . . of a . . . subsidiary . . . followed by employment or reemployment with the purchaser . . ., or an offer of employment by such purchaser . . . on terms and conditions substantially comparable in the aggregate . . . to the terms and conditions of Participant's employment with the Company or its subsidiary immediately prior to such transaction.

(Dkt. #7-2 at 6).

The parties do not dispute that Ferris is a Plan Participant and that he became employed by the purchaser following the cessation of his employment with Blucora. However, they diverge on the correct interpretation of the Plan. Ferris argues that he incurred a Qualifying Termination because his position at New LLC was "not on

---

[4] The Plan and the Plan Administrator's benefits determinations are referred to in the Complaint and are central to Ferris's claims. Therefore, the Court may consider them here.

terms and conditions substantially comparable to the terms and conditions of his employment with Blucora immediately prior to the Change in Control." (Dkt. #1 at 5).

The Plan Administrator disagreed, concluding that Ferris's termination was excepted from the definition of "Qualifying Termination" because he "remained employed by New LLC." (Dkt. #7-3 at 4). Under the Plan Administrator's interpretation, a Participant has not incurred a Qualifying Termination if the "cessation of [his] employment" was followed by either

> (1) "employment or reemployment with the purchaser," *or*
>
> (2) "an offer of employment by such purchaser . . . on terms and conditions substantially comparable . . ."

(Dkt. #7-3 at 4). This interpretation reads "on terms and conditions substantially comparable" as modifying only "an offer of employment." In other words, according to the Plan Administrator, the modifying phrase "applies only to situations where a participant has refused an offer of employment from a purchaser or successor in interest and, after declining such offer, such participant has a cessation of employment." (Dkt. #7-3 at 4). Thus, the Plan Administrator concluded that it was irrelevant whether Ferris's employment with New LLC was "on terms and conditions substantially comparable" to his previous position "[s]ince [Ferris] did not refuse an offer of employment from the Buyer." (Dkt. #7-3 at 5–6).

This case turns on whether the phrase "on terms and conditions substantially comparable" modifies *both* "employment or reemployment" and "an offer of employment." If it modifies both, then Ferris would be entitled to severance benefits if the terms and conditions of his employment with New LLC were not substantially

comparable to his previous employment. But if this qualification applies only where an offer of employment was made—but not where employment occurred—then the Plan Administrator was correct to deny Ferris benefits since he was employed by New LLC. Syntacticians, grab your popcorn.

## A. The Plan Administrator's Interpretation Is Legally Correct.

ERISA Section 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." When, as here, the plan vests the plan administrator with discretionary authority to interpret the plan's provisions, the Court reviews the plan administrator's interpretation for abuse of discretion. *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 269 (5th Cir. 2004); *see generally* (Dkt. #7-2 at 10) ("The Plan Administrator shall have the duty and authority to interpret and construe, in its sole discretion, the terms of the Plan in regard to all questions of eligibility, the status and rights of Participants, and the manner, time and amount of any payment under the Plan.").

The Court utilizes a two-step process to review the Plan Administrator's interpretation of the Plan. First, the Court "must determine the legally correct interpretation of the [P]lan." *Ellis*, 394 F.3d at 269. If the Plan Administrator's interpretation is legally correct, "the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation . . . was not an abuse of discretion." *Id.* at 270. However, if the interpretation was not legally correct, the Court must then consider whether the decision was an abuse of discretion. *Id.* at 269–70.

8

To determine whether the interpretation is legally correct, the Court considers "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Id.* at 270.[5]

### i. Uniform Construction

Neither party argues that the Plan Administrator has or has not given the Plan a uniform construction. Nor does Ferris allege any facts indicating that the Plan Administrator has been inconsistent in his interpretation.[6] To the contrary, Ferris alleges that the "the absence of severance benefits left Ferris, as well as all other similarly situated New LLC transferees, without recourse," which suggests that the Plan Administrator has interpreted the Plan uniformly. (Dkt. #1 at 6). However, without more detailed allegations or argument from the parties, the Court will consider this factor to be neutral.

### ii. Fair Reading

As a general rule, ERISA plan provisions "are to be read according to their plain meaning and as they are likely to be 'understood by the average plan

---

[5] Neither party explicitly addresses these factors in their briefs. However, following Fifth Circuit precedent, the Court will consider all three factors, notwithstanding the lack of argument from the parties.

[6] Ferris alleges that "there was manipulation, insider-preference, and flawed Plan administration that permitted some Plan participants, prior to the Change in Control, to challenge their proposed 'reemployment' with New [LLC] as a 'resignation for good reason.' . . . [U]nlike these insiders who were given the opportunity to resign for Good Reason in connection with the sale to obtain severance benefits under the Plan, Ferris was not." (Dkt. #1 at 6). This allegation does not address the Plan's construction, but rather the application of a separate provision. Ferris is not challenging an interpretation of the "resignation for Good Reason" provision, nor does he allege or explain how that provision— or the Plan writ large—has been inconsistently construed.

participant.'" *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 251 (5th Cir. 2019) (cleaned up). "Federal common law governs the interpretation of all ERISA-regulated plan provisions," though courts can use state law as a guide. *Id.* at 252 (cleaned up). Here, the plan invokes the laws of Texas. In Texas, "[l]anguage used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985).

It is not obvious whether the modifying phrase at issue here applies to both "employment or reemployment" and "an offer of employment," or just the latter— despite the parties' contentions that it is abundantly clear that their interpretation is the correct one. But "[a]mbiguity does not arise because of a simple lack of clarity, or because the parties proffer different interpretations." *Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 728 (5th Cir. 2017) (cleaned up). "Texas courts apply canons of construction prior to deciding whether a term is ambiguous: '[i]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous.'" *Flagship Credit Corp. v. Indian Harbor Ins. Co.*, 481 F.App'x 907, 911 (5th Cir. 2012) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). Several canons and other general rules of interpretation guide the Court's resolution here.

### 1. The unambiguous language supports the Plan Administrator's interpretation.

First, the last-antecedent rule.[7] This rule—advanced by Defendants—provides that "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart*, 577 U.S. at 351 (cleaned up). "The rule reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it. That is particularly true where it takes more than a little mental energy to process the individual entries in the list, making it a heavy lift to carry the modifier across them all." *Id.* This rule teaches that the phrase "on terms and conditions substantially comparable" only modifies the phrase it immediately follows—"an offer of employment by such purchaser."

Ferris, in contrast, urges the Court to apply the series-qualifier canon. That rule provides that "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402, 141 S.Ct. 1163, 209 L.Ed.2d 272 (2021) (quoting Scalia & Garner, *supra*, at 147). This rule generally applies when the modifying phrase "immediately follows a concise,

---

[7] Technically, only pronouns have antecedents. *See* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152 (2012). Thus, the nearest-reasonable-referent-canon—which generally stands for the same proposition as the last-antecedent rule—is likely the correct syntactic tool, as there is no pronoun present here. However, the Supreme Court has invoked the "rule of the last antecedent" when it considered a similarly structured text, likewise with no pronoun. *Lockhart v. United States*, 577 U.S. 347, 351, 136 S.Ct. 958, 194 L.Ed.2d 48 (2016) (concluding that the phrase "involving a minor or ward" only modified "abusive sexual conduct" in the phrase "aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward"). This Court will follow the Supreme Court's terminology and refer to the rule as the last-antecedent rule.

integrated clause" that "hangs together as a unified whole" or when "a qualifying phrase [is] separated from antecedents by a comma." *Id.* at 403–04 (quoting W. Eskridge, INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67–68 (2016)). However, "the insertion of a determiner before the second item tends to cut off the modifying phrase so that its backward reach is limited." Scalia & Garner, *supra*, at 149.[8]

Application of these syntactic tools reveals that the Plan Administrator's interpretation is correct—"on terms and conditions substantially comparable" only modifies "an offer of employment," not "employment or reemployment." Standard English and the last-antecedent rule hold that "it is easier to apply [a] modifier only to the item directly before it." *Lockhart*, 577 U.S. at 351. The structure of the sentence at issue proves that point. The modifying phrase here is attached only to "an offer of employment," a phrase separated relatively significantly from "employment or reemployment." It would be odd for the drafters of the Plan to separate "employment or reemployment" from "an offer of employment"—all of which are similar actions, albeit the first two are more alike—and then attach a modifier to only the latter phrase but intend for it to modify all. If the modifier were meant to attach to both phrases, it would make little sense to separate them, as the separation only works to make the sentence unnecessarily long, requiring the drafters to include the phrase "by such purchaser or successor in interest," when the referent is already in the

---

[8] For example, in the phrase "[a] wall or fence that is solid," the series-qualifier canon would hold that "the wall as well as the fence must be solid." Scalia & Garner, *supra*, at 148. But if the phrase instead read "[a] wall or a fence that is solid," the "wall may probably have gaps." *Id.* at 149.

preceding phrase. An easier and shorter sentence that would result in modification to both phrases could read:

> the cessation of Participant's employment with the Company . . . followed by [an offer of employment,] employment[,] or reemployment with the purchaser or successor in interest to Participant's employer with regard to such division, business unit or subsidiary, ~~or an offer of employment by such purchaser or successor in interest~~ on terms and conditions substantially comparable . . .

Instead, because the phrases are separated, Ferris's interpretation requires the reader to "carry the modifier across" the list. And the list itself "takes more than a little mental energy to process," as the items in the list contain substantive terms and internal lists—i.e., "purchaser or successor in interest," "division, business unit or subsidiary."

Ferris argues that "[t]he last-antecedent rule . . . is inapplicable to the grammatical construction present here where the modifying clause appears at the end of [a] list." (Dkt. #10 at 16). To support this proposition, Ferris cites *Facebook*, where the Supreme Court explained that it has "declined to apply the rule where . . . the modifying clause appears after an integrated list." 592 U.S. at 404. But the list in the Plan is not an integrated list. Instead, the list consists of two phrases disjoined by the word "or."[9] This is a paradigmatic case for application of the last-antecedent rule.

---

[9] "Or" is usually disjunctive—meaning it "express[es] a choice between two mutually exclusive possibilities." *Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*, 416 S.W.3d 750, 755 (Tex. App.—El Paso 2013). Here, "employment or reemployment" is separated from "an offer of employment by such purchaser . . . on terms and conditions substantially comparable" by "or." (Dkt. #7-2 at 6). Defendants argue that the disjunctive nature of "or" alone supports their reading, as only the latter "offer of employment" phrase is connected to the modifying phrase. However, this alone does not lend much support to the Plan Administrator's

The series-qualifier canon does not help Ferris, for many of the same reasons. For starters, the modifier does not follow a "concise, integrated clause" that "hangs together as a unified whole." *See Facebook*, 592 U.S. at 403–04. As explained above, the two operative phrases here—"employment or reemployment" and "an offer of employment"—are separated by a disjunctive "or." Further, both phrases describe with whom the employment action needs to occur—i.e., "the purchaser or successor in interest." *See* (Dkt. #7-2 at 6) (". . . followed by employment or reemployment with the purchaser or successor in interest to Participant's employer . . ., or an offer of employment by such purchaser or successor in interest . . ."). The fact that both contain this qualifier—with the "offer of employment" phrase using the pronoun "such" to refer back—indicates that these sentences are not integrated and that they do not hang together as a unified whole, but rather operate as distinct phrases. Additionally, the antecedent/pronoun structure makes this sentence verbose, not concise.

Moreover, the phrases do not contain "*all* nouns or verbs in a series." *See Facebook*, 592 U.S. at 402 (emphasis added) (quoting Scalia & Garner, *supra*, at 147). Instead, the phrases contain various parts of speech, including nouns, prepositions, and adjectives. This further indicates that the series-qualifier canon does not control here.

---

interpretation, as "or" merely works to separate the employment actions—"employment or reemployment" and "offer of employment"—but does not indicate whether the modifying phrase modifies both.

Further, as the Court in *Facebook* explained, "[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." *Id.* at 403–04 (quoting Eskridge, *supra*, at 67–68) (alteration in original). Such evidence is absent here, as there is no comma separating the qualifying phrase from "an offer of employment."

Finally, the "determiner" exception to the series-qualifier canon strongly indicates that the modifying phrase only modifies "an offer of employment." *See* Scalia & Garner, *supra*, at 149 ("With postpositive modifiers, the insertion of a determiner before the second item tends to cut off the modifying phrase so that its backward reach is limited—but that effect is not entirely clear."). Here, the determiner—"an"—precedes the second item—"offer of employment"—thus limiting the modifying phrase to "offer of employment." This conclusion is further bolstered by the use of the comma immediately before "or," which further segregates the modifying phrase from "employment."

Because the Court finds that application of the interpretive canons reveals the meaning of the Plan, the Court need not delve into substantive canons—such as *contra proferentem*. *See Ramirez*, 872 F.3d at 725 ("Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are courts compelled to apply the rule of *contra proferentem* and construe the terms strictly in favor of the insured." (cleaned up)). And the Court disagrees with Ferris that the Plan Administrator's interpretation leads to an absurd result or contradicts the purpose of

the Plan, which is to "secure the continued services of certain key employees . . . and to ensure their continued dedication to their assigned duties without distraction in the event of any threat or occurrence of a Change of Control." (Dkt. #7-2 at 2). To the contrary, the Court finds that *Ferris's* reading of the Plan is incompatible with the other terms of the Plan, as discussed next.

### 2. The Plan Administrator's interpretation comports with the other terms of the Plan.

Ferris argues that the Plan Administrator's interpretation of the Plan would lead to absurd results. He posits that if *any* continued employment with the purchaser disqualifies a Participant from being able to claim that he incurred a Qualifying Termination, then a former Blucora executive who was reassigned by New LLC to work as a janitor would be without redress. However, Ferris ignores other terms of the Plan that would provide recourse to the individual contemplated in this hypothetical.

Recall that Qualifying Termination includes the "resignation by Participant for Good Reason." (Dkt. #7-2 at 6). The Plan enumerates several Good Reasons, including:

> (i) a material reduction of or to Participant's duties, authority or responsibilities (provided that a change in Participant's duties, authority or responsibilities as the result of one or more corporate transactions, by itself, does not constitute a material reduction); (ii) a material reduction of Participant's Base Salary; [and] ([iii]) a material reduction of Participant's target annual bonus . . .

(Dkt. #7-2 at 5).

If a Participant were as drastically affected by the Change of Control as the janitor in Ferris's hypothetical, presumably he could assert at least one—if not all

16

three—of the Good Reasons for resignation recited above, and thus he would be eligible for severance benefits so long as he complied with the governing procedure. Indeed, Ferris's executive-demoted-to-janitor hypothetical squarely presents a scenario in which a "Good Reason" resignation likely would be warranted under the Plan. Thus, rather than an "absurd result," the Plan Administrator's interpretation is consistent with the framework of the Plan, which contemplates that a Participant who retains employment with the purchaser does not experience a Qualifying Termination *unless* he resigns for Good Reason, meaning he experienced a material reduction to his duties, his Base Salary, his target annual bonus, or he suffered from another enumerated Good Reason.

In short, executives-turned-janitors subject to this Plan need not despair. Contrary to Ferris's argument, executives who face drastic degradations to their position or pay may resign for Good Reason, entitling them to severance benefits. However, Participants who do not resign for Good Reason, but instead remain employed by the purchaser—like Ferris—do not incur a Qualifying Termination, and thus are not entitled to severance benefits. The Plan Administrator's interpretation is consistent with this logical result.

\*      \*      \*

In sum, the Court concludes that the Plan Administrator correctly read the Plan to exclude from the definition of "Qualifying Termination" instances where the Participant's termination was "followed by employment . . . with the purchaser," regardless of whether the subsequent employment was "on terms and conditions

substantially comparable" to his or her previous employment. This reading accords with ordinary grammar usage and the canons of construction, and it is the most plausible interpretation of the provision. Thus, the second factor strongly favors the Plan Administrator's interpretation.

### iii. Unanticipated Costs

Finally, courts consider "whether a different interpretation of the plan would result in unanticipated costs to the plan." *Ellis*, 394 F.3d at 271. Ferris's interpretation would require the Plan to pay severance benefits when a Participant is employed by the purchaser, but on terms and conditions different than his or her previous employment. As the Court explained above, this interpretation is incorrect. Certainly, then, this interpretation would lead to unanticipated costs. Therefore, this factor favors the Plan Administrator's interpretation.

*       *       *

Considering all three factors, the Court concludes that the Plan Administrator's interpretation is legally correct, and, therefore, he did not abuse his discretion. *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 n.2 (5th Cir. 2009) ("If the determination was legally correct, there is no abuse of discretion."). The uniform construction factor is neutral, and the other two factors—whether the interpretation is consistent with a fair reading of the Plan, and whether unanticipated costs would result from a different interpretation—heavily favor the Plan Administrator's interpretation. Since the interpretation is legally correct, "the

inquiry is over," and there is no need to analyze whether the interpretation is an abuse of discretion. *Ellis*, 394 F.3d at 270.

## B. Relief Under Section 502(a)(3)

Ferris seeks alternative redress under ERISA Section 502(a)(3),[10] which entitles a plan participant to sue "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." This provision is a "catchall" that "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). "Generally, an ERISA § 502(a)(3) claim for equitable relief may not be maintained when ERISA § 502(a)(1)(B) affords an adequate remedy." *Manuel v. Turner Indus. Grp., L.L.C.*, 905 F.3d 859, 865 (5th Cir. 2018) (cleaned up). Thus, when a participant's "injury creates a cause of action under ERISA § 502(a)(1)(B), [he] may not proceed with a claim under ERISA § 502(a)(3)." *Id.* (cleaned up).

Here, Defendants argue that Ferris's alternative request for relief under Section 502(a)(3) is impermissibly duplicative and must be dismissed. Defendants rightly aver that Ferris only alleges one injury—not receiving severance benefits— and that his injury is based on the same conduct—the Plan Administrator's interpretation of the Plan. In response, Ferris does not defend his claim, instead

---

[10] This section is codified at 29 U.S.C. § 1132(a)(3).

asserting that Defendants' argument for dismissal is "premature." (Dkt. #10 at 23 n.2). But facing a motion to dismiss is the precise time that a party should respond. Failure to do so may constitute abandonment of a claim. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (explaining that failing to defend or pursue a claim in response to a motion to dismiss constitutes abandonment).

In his sur-reply, Ferris drops a footnote explaining that Defendants' recitation of the law concerning duplicative 502(a)(3) claims is wrong, stating that the "question is not whether a plaintiff pleads claims under both subsections but whether the plaintiff's claim under Section [502](a)(3) 'effectively constitute[s] a "repackaging of" a claim under [S]ection [502](a)(1).'" (Dkt. #19 at 14 n.27) (quoting *Currier v. Entergy Corp. Emp. Benefits Comm.*, No. 16-2793, 2016 WL 6024531, at *5 (E.D. La. Oct. 14, 2016)). He further asserts that "the line between legal relief and equitable relief is not always boldly drawn, and the legal and factual bases for a plaintiff's claims may come into clearer focus as the litigation proceeds," and that "[t]his is especially true here where Plaintiff has alleged 'manipulation, insider-preference, and flawed Plan administration.'" (Dkt. #19 at 14 n.27) (cleaned up). This footnote does not save Ferris's claim.

First, Ferris did not address whether his injury created a cause of action under Section 502(a)(1)(B). If it did, then he cannot bring a claim premised on the same injury under Section 502(a)(3). *Manuel*, 905 F.3d at 865. Based on the allegations in the Complaint, the Court concludes that Ferris's injury—the denial of benefits— created a cause of action under Section 502(a)(1)(B). 29 U.S.C. § 1132(a)(1)(B) ("A

civil action may be brought by a participant . . . to recover benefits due to him under the terms of his plan."). Ferris offers no alternative injury, and he does not explain how his single injury could not be remedied by Section 502(a)(1)(B). The fact that Ferris's Section 502(a)(1)(B) claim is unsuccessful does not render his Section 502(a)(3) claim viable. *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998).

Second, Ferris's assertion that "legal and factual bases . . . may come into clearer focus as the litigation proceeds" is unhelpful. Here, the litigation cannot proceed because Ferris failed to state a claim upon which relief can be granted and failed to explain how his injury is not redressable by Section 502(a)(1)(B). And he does not elaborate on his claim that this general proposition is "especially true here." This bald statement provides no reason to find that Ferris has a viable claim. It is less a defense of his claim, and more a promise to explain later. But Ferris was required to defend his claim now. Because Ferris failed to show—or even argue—that Section 502(a)(1)(B) is inadequate, his Section 502(a)(3) claim must be dismissed.

## C. Leave To Amend

Ferris requests leave to amend his Complaint to remedy any deficiencies the Court finds. Pursuant to Federal Rule of Civil Procedure 15(a)(2), courts "should freely give leave when justice so requires." However, a court acts within its discretion when it denies leave to amend after determining that any amendment would be futile. *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014). Amendment is futile if the "amended complaint would fail to state a claim upon which relief could be granted." *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

Here, no amendment could change the fact that the Plan Administrator correctly interpreted the Plan and that Section 502(a)(1)(B) provided an adequate remedy for Ferris's only injury—not receiving benefits. Thus, any amended complaint would still fail to state a claim upon which relief could be granted. Therefore, amendment would be futile, and leave is accordingly denied.

## D. Attorney's Fees

The Court notes that Defendants request attorney's fees under 29 U.S.C. § 1132(g)(1). However, the Court will not consider Defendants' request at this time. Instead, Defendants may move for attorney's fees after the Court enters final judgment, in accordance with Federal Rule of Civil Procedure 54(d).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Ferris failed to state a claim upon which relief can be granted. Therefore, it is **ORDERED** that Defendants' Motion to Dismiss, (Dkt. #7), is **GRANTED**. Ferris's Complaint is **DISMISSED with prejudice**.

It is further ordered that the two Motions Concerning Waiver of Service of Process, (Dkt. #2, #4), are **DENIED as moot**. Federal Rule of Civil Procedure 4 does not require an order to effectuate waiver of service.

**So ORDERED and SIGNED this 10th day of June, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

22